The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: June 3, 2025

**No. A-1-CA-42006**

**MARIO ATENCIO; PAUL AND MARY ANN ATENCIO; DANIEL TSO; SAMUEL SAGE; CHEYENNE ANTONIO; KENDRA PINTO; JULIA BERNAL; JONATHAN ALONZO; PASTOR DAVID ROGERS; YOUTH UNITED FOR CLIMATE CRISIS ACTION (YUCCA); PUEBLO ACTION ALLIANCE; INDIGENOUS LIFEWAYS; CENTER FOR BIOLOGICAL DIVERSITY; and WILDEARTH GUARDIANS,**

Plaintiffs-Appellees,

v.

**STATE OF NEW MEXICO; NEW MEXICO LEGISLATURE; GOVERNOR MICHELLE LUJAN GRISHAM; NEW MEXICO ENVIRONMENT DEPARTMENT; SECRETARY JAMES KENNEY, in his official capacity; ENERGY, MINERALS & NATURAL RESOURCES DEPARTMENT; SECRETARY DESIGNATE MELANIE A. KENDERDINE, in her official capacity; ENVIRONMENTAL IMPROVEMENT BOARD; and the OIL CONSERVATION COMMISSION,**

Defendants-Appellants,

and

**INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO,**

Intervenor/Defendant,

and

**NEW MEXICO CHAMBER OF COMMERCE,**

Intervenor/Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY Matthew Wilson, District Court Judge**

Gail Evans
Colin Cox
Albuquerque, NM

for Appellee Center for Biological Diversity

Tim Davis
Samantha Ruscavage-Barz
Santa Fe, NM

for Appellee WildEarth Guardians

Daniel Yohalem
Santa Fe, NM

for Appellees

Raúl Torrez, Attorney General
Mark W. Allen, Assistant Attorney General
Seth C. McMillan, Deputy Solicitor General
Ellen Venegas, Assistant Solicitor General
Santa Fe, NM

for Appellants State of New Mexico, Environmental Improvement Board and Oil Conservation Commission

Hinkle Shanor LLP
Thomas M. Hnasko
Lisa G. Zammiello
David A. Lynn
Santa Fe, NM

for Appellant The New Mexico Legislature

Peifer, Hanson, Mullins & Baker, P.A.
Elizabeth K. Radosevich
Matthew E. Jackson
Albuquerque, NM

for Appellants Governor Michelle Lujan Grisham, New Mexico Environment Department, Secretary James Kenney, Energy, Minerals & Natural Resources Department, and Secretary Designate Melanie A. Kenderdine

Baker & Hostetler LLP
Mark S. Barron
Denver, CO

for Appellant New Mexico Chamber of Commerce

Vernon Law and Graduate School
Mia Montoya Hammersley, Assistant Professor of Law & Director
Christophe Courchesne, Associate Professor of Law & Director
Charlotte Bieri, Student Clinician
Savannah Collins, Student Clinician
Hannah Ziomek, Student Clinician
Lauren Carita, Student Clinician
Royalton, VT

Washburn University School of Law
James R. May, Richard S. Righter Distinguished Professor of Law
Topeka, KS

Northeastern University School of Law
Martha F. Davis
Boston, MA

for Amici Curiae Law Professors in Support of Plaintiffs-Appellees

Fine Law Firm
Mark Fine
Albuquerque, NM

University of Wisconsin Law School
Steph Tai, Associate Dean
Madison, WI

for Amici Curiae Public Health Professionals in Support of Plaintiffs-Appellees

**OPINION**

**HANISEE, Judge.**

{1}     This case presents novel questions of state law regarding the justiciability of claims alleging failures of the State, its legislative and executive branches of government, and several of its administrative entities and officers to adequately control pollution caused during the extraction and production of oil and natural gas. Plaintiffs, who are various advocacy organizations and individual New Mexicans, including several Indigenous people, filed suit against various executive agencies and officials, including Governor Michelle Lujan Grisham, the State of New Mexico itself, and the Legislature (all Defendants collectively referred to hereinafter as Defendants).[1] Plaintiffs seek various forms of declaratory and injunctive relief that, in general terms, call for the judiciary to declare that the current statutory and regulatory scheme controlling pollution from oil and natural gas fails to protect the environment under Article XX, Section 21 of the New Mexico Constitution (the

---

[1]For clarity and ease of reference, we collectively refer to the Governor, the New Mexico Environment Department (NMED), Secretary Kenney, the Energy, Minerals and Natural Resources Department (EMNRD), Secretary Designate Kenderdine, the Environmental Improvement Board (EIB), and the Oil Conservation Commission (OCC) as "Executive Defendants." When referring to all the Defendants together, we use the term "Defendants."

After initial pleadings in the case, Defendants New Mexico Chamber of Commerce (the Chamber) and Independent Petroleum Association of New Mexico (IPANM) intervened on behalf of Defendants. The Chamber and IPANM are included in our use of "Defendants" in this opinion.

Pollution Control Clause or PCC) and enjoin Defendants from permitting further oil and gas extraction until sufficient environmental protections are established. Plaintiffs further claim, via the New Mexico Civil Rights Act (NMCRA), NMSA 1978, §§ 41-4A-1 to -13 (2021), and the Declaratory Judgment Act (DJA), NMSA 1978, §§ 44-6-1 to -15 (1975), that the inadequacy of the current system regulating oil and gas pollution violates their constitutional rights to due process and equal protection of law under New Mexico's Bill of Rights. *See* N.M. Const. art. II, § 18. Defendants variously moved for dismissal of Plaintiffs' complaint or judgment on the pleadings in their favor. The district court substantially denied Defendants' motions, concluding that Plaintiffs set forth claims upon which relief can be granted. Defendants sought interlocutory appeal, which we granted. We conclude Plaintiffs have presented no claim upon which relief can be granted and reverse.

**BACKGROUND**

{2}     This case arises over pollution caused by oil and gas extraction primarily in the northwest and southeast regions of New Mexico, known respectively as the San Juan and Permian Basins. The individual Plaintiffs live or work in close proximity to these regions or have significant cultural, ancestral, and religious ties to them. The organizational Plaintiffs are various advocacy groups representing populations particularly affected by climate change such as youths, Indigenous communities, and other grouped individuals living and working in the San Juan and Permian Basins.

Plaintiffs assert concrete, particularized, actual or imminent harm from Defendants' alleged collective failure to enact and enforce sufficient laws and regulations to protect the environment from oil- and gas-derived pollution.

{3}    Plaintiffs' complaint first points to our state constitution's PCC, which provides the following:

> The protection of the state's beautiful and healthful environment is hereby declared to be of fundamental importance to the public interest, health, safety and the general welfare. The [L]egislature shall provide for control of pollution and control of despoilment of the air, water and other natural resources of this state, consistent with the use and development of these resources for the maximum benefit of the people.

N.M. Const. art. XX, § 21. Plaintiffs assert that this provision creates a "positive, mandatory, and judicially enforceable duty on the Legislature" to control pollution and to protect New Mexico's natural resources from despoilment. The complaint alleges that the Legislature, in violation of the PCC, has not passed sufficient laws to protect the state's natural resources. For instance, the complaint asserts that Defendant NMED, whose purpose is, in part, to protect New Mexicans "from health threats posed by the environment," NMSA 1978, § 74-1-2 (1997), is—despite the agency's name and other duties related to New Mexico's environment—statutorily prohibited from regulating the oil and gas industry except to address air quality.

{4}    Plaintiffs' complaint further states that each of the following legislative enactments, which the NMED is tasked with enforcing, *see* NMSA 1978, § 74-1-7

3

(2000, amended 2024),[2] expressly exempts the oil and gas industry from its purview: the Hazardous Waste Act, NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2021); the Radioactive and Hazardous Materials Act, NMSA 1978, §§ 74-4A-1 to -14 (1979, as amended through 2023); the Solid Waste Act, NMSA 1978, §§ 74-9-1 to -43 (1990, as amended through 2011); the Groundwater Protection Act, NMSA 1978, §§ 74-6B-1 to -14 (1990, as amended through 2018); and the Water Quality Act (WQA), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2019).[3]

---

[2]This section of the Hazardous Waste Act was amended after Plaintiffs filed their complaint in this case. *See* 2024 N.M. Laws, ch. 54, § 2 (adding Section 74-1-7(A)(15) and amending other subsections to permit the NMED's regulation of transportation fuels). Because this amendment was enacted after this case began, and because Plaintiffs make no argument to the contrary, we do not consider its effect in this opinion. *See GEA Integrated Cooling Tech. v. N.M. Tax'n & Revenue Dep't*, 2012-NMCA-010, ¶ 17, 268 P.3d 48 ("Our courts follow the general rule that a statutory amendment applies prospectively unless the Legislature clearly intends to give the amendment retroactive effect.").

[3]The individual provisions to which Plaintiffs point within each act are: Section 74-4-3(K)(2)(a)-(g) ("'Hazardous waste' does not include . . . drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil or natural gas" as well as various forms of ash, slag, and gas emission waste caused by oil and natural gas production); Section 74-4A-4(d) (excluding the same from the definition of "hazardous waste" in the Radioactive and Hazardous Materials Act); Section 74-9-3(N)(1)-(2) (excluding the same from the definition of "solid waste" under the Solid Waste Act); Section 74-6B-3(A)(3) (excluding from the Groundwater Protection Act fluid storage tanks common in the oil and gas industry such as any "surface impoundment, pit, pond or lagoon"); Section 74-6-12(G) ("The [WQA] does not apply to any activity or condition subject to the authority of the oil conservation commission pursuant to provisions of the Oil and Gas Act.").

{5}     Plaintiffs' complaint goes on to contend that only one act, the New Mexico Air Quality Control Act (NMAQCA), NMSA 1978, §§ 74-2-1 to -17 (1967, as amended through 2021), "actually mandates the prevention or control of" oil and gas pollution, and that it is limited to regulating air quality. The complaint asserts that, despite the NMAQCA's existence, Defendants have failed to comply with the Act or adequately enforce its requirements, alleging that pollution levels in and around the San Juan and Permian Basins have consistently exceeded those permitted by the NMAQCA. Plaintiffs' complaint continues by asserting that other legislative enactments, such as the Oil and Gas Act, NMSA 1978, §§ 70-2-1 to -39 (1935, as amended through 2019), do not control pollution.

{6}     In addition to attacking the adequacy of existing laws, Plaintiffs' complaint alleges that the Legislature has failed to provide regulatory agencies with sufficient resources, primarily money, to "regulate, monitor and control" oil and gas pollution. The complaint points to insufficient staffing levels within the NMED and Defendant EMNRD, stagnant department budgets, and insufficient oversight and financial assurance requirements regarding cleanup and closure of abandoned oil and gas wells.

{7}     As to the Executive Defendants, Plaintiffs assert that they have failed to enforce statutes and regulations already in existence and have not promulgated constitutionally adequate regulations to control pollution. Plaintiffs' complaint

5

alleges that Executive Defendants are all varyingly responsible for overseeing, maintaining, developing, or enforcing laws and regulations that protect the environment; yet, each has failed their constitutional and statutory duties to do so. For instance, Plaintiffs' complaint points out that Defendant EIB exempts the oil and gas industry from its regulations limiting toxic air pollutants, *see* 20.2.72.402(C)(5) NMAC, and asserts that the Governor is "ultimately responsible for all [s]tate agency actions, including the authorization of oil and gas production with inadequate pollution controls."

{8}     Based on the above allegations, Plaintiffs advance five causes of action against Defendants. First, by use of the DJA, Plaintiffs assert that Defendants collectively violate their constitutional duties under the PCC by failing to enact sufficient pollution-limiting legislation, continuing to permit oil and gas production despite such legislative inadequacy, and failing to enforce existing state and federal pollution limitations. Second, Plaintiffs pursue four causes of action variously asserting that Defendants' alleged failures violate Plaintiffs' rights under the Inherent Rights, Due Process, and Equal Protection Clauses of the state constitution. *See* N.M. Const. art. II, § 4 ("All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."); N.M. Const. art. II, § 18 ("No person

6

shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws."). Plaintiffs advance their substantive due process and equal protection claims under the DJA and the NMCRA, which provide a private right of action for alleged violations of New Mexico's Bill of Rights. *See* § 41-4A-3(B); *see also* N.M. Const. art. II, §§ 1-24 (containing the Bill of Rights, which includes the Inherent Rights Clause, N.M. Const. art. II, § 4, and the Due Process and Equal Protection Clauses, N.M. Const. art. II, § 18).

{9}     In terms of relief, Plaintiffs request an order consistent with the above claims that amounts to various declarations that Defendants are out of compliance with their constitutional duties under the PCC and the New Mexico Bill of Rights. Regarding injunctive relief, Plaintiffs ask, among other things, that the judiciary enjoin Defendants to suspend additional permitting of oil and gas wells until Defendants have come into compliance with their constitutional duties by "enact[ing], fund[ing] and implement[ing] a statutory, regulatory and enforcement structure and plan" that complies with the PCC. Plaintiffs further seek an order requiring Defendants to "put in place a mandatory process whereby [Defendants] formally and publicly consider their constitutional obligations . . . when considering any policies or laws that impact New Mexico's natural resources." Finally, Plaintiffs ask that the judiciary retain ongoing jurisdiction over the case to ensure that Defendants comply with such directives.

{10}     Defendants moved separately either for dismissal of Plaintiffs' claims or for judgment on the pleadings in Defendants' favor. In their various motions, Defendants all advance generally the same arguments: neither the PCC nor any other constitutional provision supplies or enables a cause of action such as this, Plaintiffs' claims and the relief they seek violate separation of powers principles, the complaint presents nonjusticiable political questions, a judicial determination in Plaintiffs' favor will not redress their alleged harms, and Defendants have already established a constitutionally adequate statutory and regulatory scheme controlling pollution caused by oil and natural gas production.

{11}     The district court substantially denied Defendants' motions, granting dismissal only of the claims against the Legislature and individual government officers alleging violations of the NMCRA. *See* § 41-4A-10 (preserving legislative immunity under the NMCRA); § 41-4A-3(C) ("Claims brought pursuant to the [NMCRA] shall be brought exclusively against a public body."). In denying the remainder of Defendants' motions, the district court stated simply that Plaintiffs alleged sufficient facts to support a claim for declaratory relief and that it was premature to determine whether "the New Mexico Constitution guarantees . . . a fundamental right to pollution control." Defendants sought interlocutory appeal in this Court, which we granted.

8

**DISCUSSION**

{12} All of the issues presented in this case, concerning both the denial of Defendants' motions and the associated statutory and constitutional arguments, are reviewed de novo. *See Valdez v. State*, 2002-NMSC-028, ¶ 4, 132 N.M. 667, 54 P.3d 71 (reviewing de novo dismissal of a case for failure to state a claim under Rule 1-012(B)(6) NMRA); *N.M. Pub. Regul. Comm'n v. New Mexican, Inc.*, 2024-NMSC-025, ¶ 17, 562 P.3d 548 (treating a motion for judgment on the pleadings the same as a motion to dismiss for failure to state a claim); *Am. Fed'n of State, Cnty. & Mun. Emps. Council 18 v. State*, 2013-NMCA-106, ¶ 6, 314 P.3d 674 (applying de novo review to matters of statutory and constitutional interpretation). In reviewing a motion to dismiss, we accept all well-pleaded factual allegations as true, but do not credit legal conclusions. *See Quarrie v. N.M. Inst. of Mining & Tech.*, 2021-NMCA-044, ¶ 5, 495 P.3d 645 ("A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint, not the facts that support it." (internal quotation marks and citation omitted)). Thus, the principal question here is whether Plaintiffs, through any version of the facts alleged, have stated a claim legally sufficient to maintain the causes of action brought against Defendants. Defendants maintain they have not.

{13} We first identify a common thread pertinent, albeit in differing ways, to each component of our analysis today: embedded in the fabric of our government lies the

9

foundational principle that each branch of government is coequal and that each, being entirely created by the Constitution of the State of New Mexico and deriving its sole authority therefrom, shall not exercise the powers of any other branch. *See* N.M. Const. art. III, § 1 ("The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others."). Nonetheless, "absolute separation of powers is neither desirable nor realistic," and the practical realities of our government require "some overlap of governmental functions." *State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 23, 125 N.M. 343, 961 P.2d 768 (internal quotation marks and citation omitted).

{14}    Within this constitutional framework, the Legislature is invested with the power to enact law and "possesses the police power, the broadest power possessed by governments, to protect public health and welfare." *Lujan Grisham v. Reeb*, 2021-NMSC-006, ¶ 14, 480 P.3d 852 (internal quotation marks and citation omitted); *see* N.M. Const. art. IV, § 1 (vesting the legislative power in a senate and house of representatives and reserving to the people the right to annul any law enacted thereby excepting, in relevant part, "laws providing for the preservation of the public peace, health or safety"). As the primary voice of the people, the Legislature is entitled to broad latitude in exercising its inherent police powers and is the body particularly

responsible for making public policy. *See Ferguson v. N.M. Highway Comm'n*, 1982-NMCA-180, ¶ 12, 99 N.M. 194, 656 P.2d 244 ("Determination of what is reasonably necessary for the preservation of the health, safety, and welfare of the general public is a legislative function and should not be interfered with absent clear abuse."); *Hartford Ins. Co. v. Cline*, 2006-NMSC-033, ¶ 8, 140 N.M. 16, 139 P.3d 176 ("It is the particular domain of the [L]egislature, as the voice of the people, to make public policy." (alteration, internal quotation marks, and citation omitted)). Particularly relevant to Plaintiffs' claims regarding inadequate funding of some of the Executive Defendants in this case, the Legislature has "exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government." *State ex rel. Schwartz v. Johnson*, 1995-NMSC-080, ¶ 14, 120 N.M. 820, 907 P.2d 1001 (internal quotation marks and citation omitted).

{15}     The power of the executive, on the other hand, at least in the context of law-making, is generally limited to vetoing or signing and enforcing the laws passed by the Legislature. *See* N.M. Const. art. IV, § 22 (providing the Governor's veto power); N.M. Const. art. V, § 4 ("[T]he [G]overnor . . . shall take care that the laws be faithfully executed."). The Legislature may delegate its rule-making authority to the executive agencies, in order to enforce the enacted laws. *See City of Albuquerque v. N.M. Pub. Reg. Comm'n*, 2003-NMSC-028, ¶ 16, 134 N.M. 472, 79 P.3d 297. But otherwise, "[a]ny legislative power that the Governor possesses must be expressly

11

granted to [them] by the constitution." *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 40, 120 N.M. 562, 904 P.2d 11 (internal quotation marks and citation omitted). If the "state constitution is silent on a particular issue," or if any residual government authority is to be found, such authority rests with the Legislature and not the executive branch. *Id.*

{16} The judiciary's role "is to construe laws and render judgments in the cases that come before it." *State ex rel. Jud. Standards Comm'n v. Espinosa*, 2003-NMSC-017, ¶ 13, 134 N.M. 59, 73 P.3d 197. When concerns regarding legislative acts are raised, courts may "conduct[] judicial review of legislation alleged to commit constitutional harm." *Lujan Grisham v. Van Soelen*, 2023-NMSC-027, ¶ 36, 539 P.3d 272. Indeed, it is axiomatic that the judiciary's "proper function and duty is to say what the law is and what the Constitution means." *Id.* (text only) (citation omitted); *see Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Essential to this purpose, and to maintaining the balance of powers in our government, it "is the constitutional responsibility of the courts" to consider the legality of government conduct and "safeguard[] constitutional rights." *Van Soelen*, 2023-NMSC-027, ¶ 38 (internal quotation marks and citation omitted). Nonetheless, this constitutional duty is not a license to review every governmental act and supplant the decisions made by coordinate branches with our own. *See id.* ¶ 37 ("[W]e will not question the

wisdom, policy, or justness of a statute, and the burden of establishing that the statute is invalid rests on the party challenging the constitutionality of the statute. . . . It is only when a legislative body adopts internal procedures that ignore constitutional restraints or violate fundamental rights[] that a court can and must become involved." *Id.* (alterations, internal quotation marks, and citation omitted)). In order to ensure that the judiciary remains in this well-defined lane, we use justiciability as a self-imposed guidepost, which includes as prudential components the doctrines of ripeness, mootness, and standing. *See New Energy Econ., Inc. v. Shoobridge*, 2010-NMSC-049, ¶ 16, 149 N.M. 42, 243 P.3d 746.

{17} With these principles in mind, we examine Plaintiffs' complaint and Defendants' ensuing arguments supporting its dismissal. On appeal, Defendants broadly present two categories of argument: (1) those challenging the judiciary's threshold ability to review Plaintiffs' claims, such as separation of powers principles and redressability; and (2) those asserting that even if the judiciary could review such claims, Defendants have satisfied their constitutional duties to control pollution. We agree with Defendants' threshold arguments and hold that Plaintiffs' claims premised upon the PCC are nonjusticiable. That is to say, the relief Plaintiffs seek—as presented by their complaint—exceeds the boundary of that which the judiciary is authorized to grant. Regarding Plaintiffs' due process and equal protection claims, we conclude they have not stated a claim upon which relief can

be granted. Given these determinations, we decline to address Defendants' substantive arguments regarding the adequacy of the existing laws and regulations currently applicable to the oil and gas industry.

{18}     Our opinion proceeds in three parts. We begin by discussing Plaintiffs' claim under the PCC. Then, we address Plaintiffs' due process claim, and, finally, their equal protection challenges.[4]

**I.     The Pollution Control Clause**

{19}     A central premise of Plaintiffs' case, embedded within their due process and equal protection claims, but particularly pertinent to their claim under the PCC, is that the Legislature has a constitutional duty to *adequately* control pollution to prevent despoilment of the state's natural resources. *See* N.M. Const. art. XX, § 21. In response, Defendants advance several arguments urging a conclusion that Plaintiffs have failed to state a justiciable claim arising under the PCC. First, they argue that the provision does not create an individual right, but instead confirms the

---

[4] We note that Defendants' arguments regarding the nonjusticiability of Plaintiffs' claims can be read to assert that the complaint presents nonredressable harms, a component of standing. *Am. Civ. Liberties Union of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 10, 144 N.M. 471, 188 P.3d 1222 (stating that "injury in fact, causation, and redressability" are requirements to obtain standing). We nonetheless elect to confer standing in this case because it involves systemic challenges to pollution control policies and separation of powers concerns, both of which are matters of great public importance. *See State ex rel. Coll v. Johnson*, 1999-NMSC-036, ¶ 21, 128 N.M. 154, 990 P.2d 1277 (conferring standing under the doctrine of great public importance and citing cases when the doctrine has been invoked to address separation of powers concerns).

Legislature's duty to balance competing policy interests: pollution limitation and natural resource development for the maximum benefit of all New Mexicans. *See id.* If the PCC does create or recognize an individual right to adequate pollution control, Plaintiffs could, at a minimum, use the DJA to compel the judiciary to recognize and enforce it. *See* § 44-6-2 ("In cases of actual controversy, district courts within their respective jurisdictions shall have power to declare rights . . . whether or not further relief is or could be claimed.").[5] Thus, whether the PCC creates an individual right to an adequate, or even a certain, judicially determined amount of pollution control is central to whether Plaintiffs have presented a viable cause of action.

{20}    Second, Defendants assert that, partly because there is no individual right to adequate pollution-limiting legislation, the judiciary cannot resolve Plaintiffs' claim without exercising authority expressly reserved to the Legislature by the PCC. *See* N.M. Const. art. XX, § 21 (stating that the "the [L]egislature shall" control pollution). On this point, Defendants rely on separation of powers principles to posit that addressing Plaintiffs' claims "would usurp the Legislature's policy-making and financial powers [and] nullify administrative procedures and agency expertise."

---

[5]Defendants also argue, for various reasons, that Plaintiffs' complaint does not present an actual controversy sufficient to maintain an action under the DJA. Because we resolve this appeal on separate grounds, we do not address this argument.

15

Lastly, Defendants assert that all of Plaintiffs' claims present political questions the judiciary cannot answer.[6] We address each of these three arguments in turn.

**A.    The PCC Does Not Create a Judicially Enforceable Individual Right to Any Measure of Pollution Control**

{21}    Much of Plaintiffs' complaint—and, in turn, their arguments on appeal—rests on the premise that the PCC recognizes a judicially enforceable right to adequate pollution control legislation or, at least, supports an inferred "fundamental right to a beautiful and healthful environment." In their complaint, Plaintiffs analogize the education clause of the state constitution, N.M. Const. art. XII, § 1, to the PCC and assert the following: "[p]ursuant to the positive right created by the [PCC], the Legislature must establish a sufficient statutory framework . . . to control pollution." On appeal, however, Plaintiffs rephrase this argument slightly, asserting that the PCC, viewed in isolation, creates a binding duty on the Legislature and the other Defendants to enact and enforce an adequate statutory scheme to limit pollution. Plaintiffs now ask that we acknowledge this duty and permit Plaintiffs to hold Defendants accountable to it. *See State ex rel. Taylor*, 1998-NMSC-015, ¶ 1 (stating that it is "the function of the judiciary to measure the acts of the executive and the

_____

[6]Defendants' arguments regarding separation of powers principles and the political question doctrine generally apply to all of Plaintiffs' claims, including those advanced under the Due Process and Equal Protection Clauses of the New Mexico Constitution. *See* N.M. Const. art. II, § 18. We address these doctrines in this section of our opinion due to their acute applicability to Plaintiffs' claims under the PCC but reference our analysis as necessary in our discussion of Plaintiffs' other claims.

16

legislative branch solely by the yardstick of the constitution" (text only) (citation omitted)).

{22} On appeal, Defendants challenge this premise. For instance, Executive Defendants broadly state, "Because [the PCC] does not create an independently enforceable right to pollution control," Plaintiffs' claim based upon the clause should be dismissed. To reiterate, the PCC states:

> The protection of the state's beautiful and healthful environment is hereby declared to be of fundamental importance to the public interest, health, safety and the general welfare. The [L]egislature shall provide for control of pollution and control of despoilment of the air, water and other natural resources of this state, consistent with the use and development of these resources for the maximum benefit of the people.

N.M. Const. art XX, § 21. Whether this provision supplies an individual right to adequate pollution control legislation, or may serve as the basis for a "fundamental right to a beautiful and healthful environment" as Plaintiffs suggest, is determined, if possible, by the plain meaning of the PCC's language. *See Hem v. Toyota Motor Corp.*, 2015-NMSC-024, ¶ 10, 353 P.3d 1219 ("Just as if we were interpreting a statute, to determine the meaning of a constitutional provision, we begin with the language used in the provision and the plain meaning of that language." (internal quotation marks and citation omitted)).

{23} By its plain text, the PCC contains no enforceable right, guaranteed to any individual or group, to be free from a given amount of pollution. Nor can it be inferred to create an enforceable right to a beautiful and healthful environment. In

17

contrast to other constitutional provisions that have been deemed to create enforceable rights, the first sentence of the PCC contains a broad statement acknowledging the importance of a healthy environment to the general public: a "beautiful and healthful environment is hereby declared to be of fundamental importance *to the public interest, health, safety and the general welfare.*" *Compare* N.M. Const. art. XX, § 21 (emphasis added), *with Van Soelen*, 2023-NMSC-027, ¶ 24 (concluding that the freedom of elections clause of the constitution, N.M. Const. art. II, § 8, "[b]y its plain language . . . implicitly asserts the importance of the free exercise of the right of suffrage" (internal quotation marks and citation omitted)). The language in the first sentence of the PCC parallels that used to set out the constitutional powers of the Legislature. *See* N.M. Const. art. IV, § 1 (vesting legislative power and exempting laws designed for the "preservation of the public peace, health or safety" from public annulment by petition). Thus, the first sentence on its own is more aptly viewed as a declaration that a beautiful and healthful environment is in the public interest and, therefore, that pollution is within the power of the Legislature to regulate.

{24}   Plaintiffs contend that the PCC stands for more than a mere declaration of legislative power to pass environmental laws because the Legislature already had such authority under its inherent police powers before the clause was added to the constitution. *Cf.* §§ 74-2-1 to -17 (comprising the NMAQCA, which was enacted in

18

1967, *before* the PCC was enacted in 1971). Plaintiffs assert that the language of the PCC makes clear that "it is more than a grant of authority—it is a mandate to act to . . . control pollution." We agree. *See Sanders-Reed v. Martinez*, 2015-NMCA-063, ¶ 16, 350 P.3d 1221 ("Article XX, Section 21 of [the New Mexico C]onstitution recognizes the duty to protect the atmosphere and other natural resources, and it delegates the implementation of that specific duty to the Legislature."). However, such alone does not resolve our inquiry because a legislative duty to control pollution does not guarantee any specific amount of pollution control to any individual or group. We, therefore, shift our analysis to the second sentence of the PCC.

{25}   As Defendants point out, the Legislature's duty to control pollution is neither absolute nor does it exist in isolation. Rather, the Legislature is directed to both "provide for" pollution control and do it in a manner "consistent with the use and development of [natural] resources for the maximum benefit of the people." N.M. Const. art. XX, § 21. The operative term, "consistent," is generally defined as "marked by harmony" and "free from variation or contradiction."[7] Thus, the plain meaning of the provision requires that legislation designed to limit pollution only do so to the extent that it does not contradict the development and use of natural resources for the stated maximum benefit of all New Mexicans. *Id.* Said differently,

---

[7] *See Consistent*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/consistent?src=search-dict-hed (last visited Mar. 8, 2025).

19

the Legislature's duty is one of balancing competing interests, neither of which will attain all that its advocates wish.

{26}     As to the manner the Legislature must undertake to fulfill its duties required by the PCC, we cannot ignore that the term "maximum benefit" is in the portion of the clause regarding "the use and development" of natural resources, and not the phrase regarding pollution control. The provision does not read, as it easily could, "The [L]egislature shall provide *for control of pollution and control of despoilment of the air, water and other natural resources of this state for the maximum benefit of the people*, consistent with the use and development of these resources." Such phrasing would indicate, if nothing else, a stronger emphasis on the pollution control portion of the provision than the resource development portion. However, such is not the wording of the constitutional provision before us. Despite Plaintiffs' suggestions to the contrary, the PCC also lacks any language that we may infer to create a standard against which the maximum amount of allowable pollution could be measured. *Contra* N.M. Const. art. XII, § 1 (stating that the state's public schools' system must be "sufficient" for education).

{27}     Throughout this case, Plaintiffs heavily rely on two cases to impliedly assert that they have an individual enforceable right to a certain amount of pollution control. First, they point to a district court case in which the district court determined that the "education system in New Mexico violates the New Mexico Constitution,

20

art. XII, § 1." *See* Decision & Order at 59, *Yazzie v. New Mexico*, No. D-101-CV-2014-02224 (1st Jud. Dist. Ct. July 20, 2018). However, *Yazzie* was not appealed and is not binding precedent. Moreover, assuming the district court's conclusion in that case to have been correct, the constitutional provision then at issue tasked the Legislature with no balancing of interests, but rather commanded that the public education system be "sufficient" to serve identified purposes. *See* N.M. Const. art. XII, § 1 ("A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."). As we stated above, the PCC contains no "sufficiency" language regarding pollution control and requires legislative balancing of competing interests. *See* N.M. Const. art. XX, § 21.

{28}     Plaintiffs similarly direct us to *Van Soelen*, in which our Supreme Court concluded that a partisan gerrymander would violate New Mexicans' constitutional rights. *See* 2023-NMSC-027, ¶¶ 22-23, 26, 34, 67. As in *Yazzie*, the constitutional right at issue in *Van Soelen*, the right to vote in free and fair elections, is categorically different than the *duty* imposed on the Legislature by the PCC. *See* 2023-NMSC-027, ¶ 22 ("The right to vote is the essence of our country's democracy, and therefore the dilution of that right strikes at the heart of representative government." (alteration, internal quotation marks, and citation omitted)); *see also* N.M. Const. art. II, § 8 ("All elections shall be free and open, and no power, civil or military,

21

shall at any time interfere to prevent the free exercise of the right of suffrage."). Thus, the reasoning in both *Yazzie* and *Van Soelen* in regard to the existence of an individual constitutional right is not applicable.

{29}     Because the PCC imposes only a duty on the Legislature to "provide for" pollution control "consistent with" resource use and development, and does not contain rights-creating language nor a standard by which we may measure pollution limitation, we conclude that it does not create an individual right the judiciary may enforce or protect. Having so concluded, and before we consider Plaintiffs' due process, inherent rights, and equal protection claims, we turn to whether the judiciary—despite the absence of an individual constitutional right to a "beautiful and healthful" environment or a specific amount of pollution-limiting legislation—otherwise has the power to consider Plaintiffs' allegations that Defendants have not fulfilled their constitutional duty to adequately control pollution.

**B.     Judicial Resolution of Plaintiffs' Claim Under the PCC Violates Separation of Powers**

{30}     Defendants' principal argument in this case is that judicial review of Plaintiffs' claims, even those advanced under our state's Bill of Rights, violates constitutional separation of powers. In general terms, Defendants assert that pollution regulation and control requires policy considerations that "balance competing social, political and economic interests" existing at the core of legislative power. Defendants extend this argument to Plaintiffs' due process and equal

22

protection claims and point to the PCC as evidence that the authority to regulate pollution is constitutionally assigned to the exclusive authority of the Legislature. *See* N.M. Const. art. XX, § 21. Defendants argue that even a declaration that Defendants have violated due process, inherent, or equal protection rights is afield of the judiciary's authority and would not redress Plaintiffs' harms because any such declaration would merely amount to "a reaffirmation of the Legislature's constitutional role to balance pollution controls consistent with the use and development of natural resources for all New Mexicans." *See id.*

{31}   While Defendants' separation of powers arguments span the gamut of Plaintiffs' claims, we address them here as a component of Plaintiffs' PCC claim because, in our view, it is the PCC that places Plaintiffs' claims beyond the reach of the judiciary. The PCC reserves to the Legislature policy decisions regarding pollution control, including balancing pollution-limiting legislation with the economic benefits obtained from oil and gas development, determining the maximum allowable amounts of pollution in the environment, and creating and funding enforcement agencies. In turn, the Legislature has delegated to Executive Defendants the regulatory and enforcement aspects of pollution control. To afford the relief sought by Plaintiffs in this case would both unconstitutionally infringe upon past legislative action and impermissibly encroach on future legislative power, as well as nullify Executive Defendants' ability to act under their statutory authority.

23

### 1. Pollution Control Policymaking Is Within the Exclusive Power of the Legislature

{32} The test for infringement on our constitutional separation of powers is whether the actions of one governmental branch "disrupts the proper balance" between the branches. *See State ex rel. Taylor*, 1998-NMSC-015, ¶ 24 (internal quotation marks and citation omitted). Here, Plaintiffs do not challenge the constitutionality of a single statute or specific government conduct. Rather, they assert that numerous legislative enactments and executive actions and inactions, operating collectively, are constitutionally inadequate.

{33} Plaintiffs' complaint states, "Defendants are violating the [PCC] by permitting oil and gas production . . . without adequately controlling pollution." However, as we explained above, the word "adequate," or any word like it, is not in the PCC. *See* N.M. Const. art. XX, § 21. If it were, judicial review could perhaps find some foothold by which we could measure the sufficiency of the Legislature's pollution control policies. Even if the provision contained a standard, however, the PCC imposes not just a duty to "provide for" pollution control, but requires that "the [L]egislature . . . shall" balance that duty against other competing interests. *See id.* At its core, Plaintiffs' complaint asks that we reweigh these interests and, separate and apart from the Legislature, determine that it has failed to balance these interests in accordance with a judicially created standard. *See id.* Such is beyond the judiciary's authority to do. *See Cline*, 2006-NMSC-033, ¶ 8 ("It is the particular

24

domain of the [L]egislature, as the voice of the people, to make public policy." (alteration, internal quotation marks, and citation omitted)).

{34} Importantly, Plaintiffs do not allege that Defendants have done *nothing* to control pollution caused by oil and natural gas production. Indeed, Defendants have so acted. *See* § 70-2-12(B)(15) (empowering the oil conservation division (OCD) of EMNRD to "regulate the disposition, handling, transport, storage, recycling, treatment and disposal of produced water during, or for reuse in, the exploration, drilling, production, treatment or refinement of oil or gas . . . in a manner that protects public health, the environment and fresh water resources"); § 70-2-12(B)(18) (empowering the OCD to "spend the oil and gas reclamation fund and do all acts necessary and proper to plug dry and abandoned oil and gas wells"); § 70-2-12(B)(21), (22) (enabling the OCD to "regulate the disposition of nondomestic wastes resulting from the exploration, development, production or storage of crude oil or natural gas" or "resulting from the oil field service industry").

{35} Although the OCD's power under these statutes is discretionary, *see* § 70-2-12(B) (stating the OCD "may" make such rules), it has exercised its authority to create rules controlling pollution. *See* 19.15.2.8(B) NMAC (requiring that virtually all operations "related to the drilling, equipping, operating, producing, plugging and abandonment of oil, gas, injection, disposal and storage wells or other facilities" be conducted "in a manner that prevents . . . the contamination of fresh waters");

19.15.27.6 NMAC (expressing, in part, that the objective in regulating "the venting and flaring of natural gas from wells and production equipment and facilities" is to "protect correlative rights, public health, and the environment"); 19.15.27.8 NMAC (prohibiting or otherwise controlling venting or flaring of natural gas and requiring that such practices conform to state and federal law); 19.15.27.9 NMAC (requiring, in part, certifying compliance with gas capture requirements).

{36} The Legislature has also required the Water Quality Control Commission (WQCC) to adopt regulations "to prevent or abate water pollution in the state or in any specific geographic area, aquifer or watershed of the state or in any part thereof, or for any class of waters." Section 74-6-4(E). We note that Plaintiffs have specifically alleged in their complaint that the enactment that created the WQCC, the WQA, Section 74-6-1, expressly exempts activities "subject to the authority of the [OCC]." *See* § 74-6-12(G). This exemption, though, is another concrete example of the balance the Legislature has performed—providing for control of water pollution consistent with the development and use of oil and gas resources. Absent a specific controversy regarding application of some rule of law or an allegation that an individual right has been violated, the judiciary cannot reweigh the Legislature's decisions balancing competing public policy decisions.

{37} The above statutes and regulations are not an exhaustive list of all the policies Defendants have created aimed at curbing pollution. As stated, we make no comment

26

on their adequacy or efficacy. Rather, such provisions indicate that the Legislature *has* complied with its constitutional duty to balance pollution control policies with resource development that maximally benefits the people of New Mexico. As evidence of this balancing, the Legislature points to the numerous ways revenue obtained from oil and gas production provides "crucial support" for "fundamental operations of [the] state." The Land Grant Permanent Fund, for example, uses proceeds from oil and gas leases to fund public education around the state. *See* Ferguson Act of 1898, ch. 489, § 1, 30 Stat. 484; Enabling Act for New Mexico, ch. 310, §§ 1, 6-9, 36 Stat. 557 (1910); N.M. Const. art. XXIV, § 1; N.M. Const. art. XII, § 12. The Legislature further points to the Severance Tax Permanent Fund and numerous tax laws that obtain funds critical to the various operations of the state. *See* N.M. Const. art. VIII, § 10; NMSA 1978, § 7-26-3 (1977) (imposing an excise tax for severance of the state's natural resources); *see also, e.g.*, NMSA 1978, § 7-25-2 (1966) ("The purpose of the Resources Excise Tax Act is to provide revenue for public purposes by levying a tax on the privilege of severing and processing natural resources within New Mexico.").

{38}     In our review of whether Plaintiffs have stated legally sufficient claims, our inquiry is limited by separation of powers and asks only whether the Legislature has complied with its constitutional duty to balance pollution control with resource development. As we have said, reweighing these interests and supplanting the

Legislature's policy choices with judicial determinations exceeds the judiciary's constitutional authority.

**2.      Granting Plaintiffs Relief Would Preempt and Nullify Existing Statutory and Regulatory Remedies Afforded by the Executive Branch**

{39}      Plaintiffs' claims are also nonjusticiable as to the Executive Defendants, because the redress Plaintiffs seek would obviate existing statutory and regulatory processes and require technical expertise that is found in Executive Defendants and that is beyond the practical capabilities of the judiciary. Our Supreme Court has cautioned

> against using a declaratory judgment action to challenge or review administrative actions if such an approach would foreclose any necessary fact-finding by the administrative entity, discourage reliance on any special expertise that may exist at the administrative level, disregard an exclusive statutory scheme for the review of administrative decisions, or circumvent procedural or substantive limitations that would otherwise limit review through means other than a declaratory judgment action.

*Shoobridge*, 2010-NMSC-049, ¶ 10 (internal quotation marks and citation omitted). Generally, courts can properly consider a declaratory judgment action before exhaustion of established administrative remedies if the "matter at issue (1) is purely legal, (2) requires no specialized agency fact-finding, and (3) there is no exclusive statutory remedy." *Id.* ¶ 12. These limitations on the use of declaratory judgment actions "respect the role of each branch of government in the constitutional scheme and the administrative processes put in place by the Legislature." *Id.* ¶ 14.

{40} Here, Plaintiffs chose not to challenge any executive administrative action related to the claims they now advance and, thus, are not attempting to circumvent an ongoing proceeding. Instead, they opted to proceed straight to the judiciary, rendering particularly relevant the principles discussed in *Shoobridge* that caution against judicial review of highly technical matters for which administrative agencies, such as some of the Executive Defendants in this case, have been statutorily created to address. *See id.* ¶ 10 (discussing our Supreme Court's admonition "against using judicial action to circumvent the requirements of administrative proceedings authorized by the Legislature" out of deference "to the legislative process that creates an agency and empowers it to adopt rules or regulations to carry out its powers"). Judicial intervention of the type Plaintiffs seek—a declaration that the laws and regulations at issue are all collectively inadequate along with a command for something different and ongoing judicial review of what that is—before Plaintiffs avail themselves of existing administrative remedies, would nullify such remedies before they are used. *Cf. id.* ¶ 14 ("Courts should not intervene to halt administrative hearings before rules or regulations are adopted.").

{41} Moreover, Plaintiffs' complaint fails to satisfy each of the three prongs mentioned in *Shoobridge* justifying declaratory relief. *See id.* ¶ 12. First, Plaintiffs' claims are not purely legal. For Plaintiffs to ultimately succeed in their case, the judiciary must engage in a sweeping factual inquiry involving the levels of pollutants

29

in the environment, their sources, and most importantly to our separation of powers concerns today, comparison of such pollution levels to any benefit they provide, however quantified.

{42} Second, Plaintiffs' claims also require technical expertise in order to determine how Defendants might more effectively protect the environment, whether such is economically and practically feasible, and if related costs benefit all New Mexicans, as required by the PCC. *See* N.M. Const. art. XX, § 21. Judicial inquiry into Plaintiffs' allegations requires precisely the expertise the Legislature has created in Executive Defendants and employed in their respective internal proceedings. *See Shoobridge*, 2010-NMSC-049, ¶ 10 (stating that courts should "defer[] to the legislative process that creates an agency and empowers it to adopt rules or regulations to carry out its powers"). The factual inquiry we discussed above reveals the necessity of specialized agency fact-finding the judiciary does not possess.

{43} Third, Defendants have created exclusive statutory and regulatory remedies to improve pollution control. The statutes and regulations we discussed above are concrete examples of this. *See, e.g.*, § 70-2-12(B)(15, 21, 22); 19.15.4.11(C) NMAC (allowing intervention in cases before the OCC if such participation "will contribute substantially to the prevention of waste, protection of correlative rights or protection of public health or the environment"). Judicial intervention before the established process is used would prematurely obviate and nullify established statutory and

30

regulatory remedies. *See Shoobridge*, 2010-NMSC-049, ¶ 14 ("Because of the necessity to respect the separate branches of government, courts should not intervene to halt administrative hearings before rules or regulations are adopted. To do so could deprive the public of the opportunity to propose rules or regulations and otherwise participate in the rule-making process."). At the very least, "the administrative agency should be given the opportunity to correct any errors that have been brought to its attention during the course of such proceedings." *Id.*

{44} For the above reasons, we conclude that Plaintiffs' claims related to the breach of constitutional duty arising under the PCC and the relief they seek are beyond the lawful scope of the judiciary's authority. *See id.* ¶ 9 ("The New Mexico Constitution establishes the legislative branch as the entity to represent the collective will of the populace for purposes of creating laws to effectuate the public policy of the [s]tate." (internal quotation marks and citation omitted)). Plaintiffs challenge a vast interwoven network of statutes and regulations rather than advancing a claim that a particular statute or rule is unlawful or constitutes a dereliction of some specific duty that is required to be performed to a particular standard. To resolve these abstract claims would require the judiciary to conduct anew the deliberative legislative process that resulted in the laws and regulations currently in place and find that they fall below a standard we alone would create. This we cannot do. *See Van Soelen*, 2023-NMSC-027, ¶ 37 ("It is only when a legislative body adopts internal

31

procedures that ignore constitutional restraints or violate fundamental rights that a court can and must become involved." (text only) (citation omitted)).

**C.      The Political Question Doctrine Cautions Against Judicial Review**

{45}      In concert with the above, we briefly address the political question doctrine, recognizing it is merely persuasive under New Mexico law, but which, as Defendants point out, urges dismissal of Plaintiffs' complaint. *See generally Baker v. Carr*, 369 U.S. 186, 208-37 (1962) (explaining the political question doctrine).

{46}      The political question doctrine initially arose in federal courts as a component of their jurisdictional limits under Article III, Section 2 of the United States Constitution. *See Baker*, 369 U.S. at 198-99. New Mexico courts, being courts of general jurisdiction and not subject to such federal limitations, are not strictly bound by the jurisdictional limits imposed by the political question doctrine. *See Van Soelen*, 2023-NMSC-027, ¶ 48 (stating that the political question doctrine, and its limits in federal court, are "nonbinding" on state courts). Nonetheless, the doctrine is relevant, if only persuasively, to prudential concerns "about the proper—and properly limited—role of courts in a democratic society." *Id.* (internal quotation marks and citation omitted); *see Baker*, 369 U.S. at 210 ("The nonjusticiability of a political question is primarily a function of the separation of powers.").

{47}      The political question doctrine represents inherent limits on the judiciary's authority—or practical capability—to decide certain types of controversies for

which judicial resolution is inappropriate under a tripartite system of government based on principles of representative democracy. *Baker*, 369 U.S. at 210-11. The United States Supreme Court has identified six such circumstances, any one of which presents a nonjusticiable political question:

> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [(2)] a lack of judicially discoverable and manageable standards for resolving it; [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [(5)] an unusual need for unquestioning adherence to a political decision already made; [(6)] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217; *see also id.* (stating if "one of these formulations is inextricable from the case" the matter becomes nonjusticiable).

{48} Here, all six circumstances are presented by Plaintiffs' complaint. First, as we discussed above, the PCC expressly commits pollution control and resource development to the Legislature. N.M. Const. art. XX, § 21. Second, the PCC contains no standard by which we may measure Defendants' environmental protection policies. *See id.* Any resolution of Plaintiffs' claims necessarily requires judicial invention of some standard of maximum allowable pollutants in the environment. Plaintiffs offer this Court no meaningful explanation of how this could be accomplished. Plaintiffs base their allegations that Defendants have failed to adequately protect the environment, in large part, on their own individualized harms.

33

However, Plaintiffs do not explain how the judiciary could create a standard for adequate pollution control laws that protects every individual in every circumstance and geographic location in the state. *See Morris v. Brandenburg*, 2016-NMSC-027, ¶ 34, 376 P.3d 836 ("[I]f it is a right, it must be made available to everyone.").

{49}     Third, as indicated by the previous two circumstances, as well as our preceding discussion, the judiciary cannot resolve Plaintiffs' claims without making a policy determination that Defendants have failed to properly balance pollution controls with resource development. Without cognizable standards the judiciary may use to make such a determination, any conclusion we could offer would simply amount to a judicial declaration that our weighing of competing interests is superior to that of the Legislature's.

{50}     Finally, the fourth, fifth, and sixth circumstances presenting a political question are presented by Plaintiffs' complaint. Each of these relates to the need for the judiciary to respect policy decisions made by "coordinate branches of government," adhere to political decisions "already made," and avoid "embarrassment" by making numerous, and possibly conflicting, pronouncements on the same questions presented to other branches. *Baker*, 369 U.S. at 217. Plaintiffs' complaint asks not only that we reconsider the policy decisions already made by Defendants, but that, in so doing, we undermine the expertise of established administrative bodies and supplant decisions they are statutorily created to make.

34

Indeed, absent specific controversies regarding particular agency decisions or regulations, and developed argument by litigants, the judiciary risks running afoul of previous, unappealed administrative rulings relating to the balance of interests articulated in the PCC.

{51} Therefore, the political question doctrine persuasively supports judicial restraint in this instance. As indicated by both our analysis of separation of powers and the political question doctrine, Plaintiffs' PCC-based claim cannot be resolved by the courts without unconstitutionally intruding upon the powers of Defendants. *See Shoobridge*, 2010-NMSC-049, ¶ 9 ("The New Mexico Constitution establishes the legislative branch as the entity to represent the collective will of the populace for purposes of creating laws to effectuate the public policy of the [s]tate." (internal quotation marks and citation omitted)). Having so concluded, we turn now to Plaintiffs' due process and equal protection claims.

**II.    Due Process**

{52} While we conclude that the PCC neither creates nor recognizes an enforceable right to a certain amount of pollution control, such does not resolve Plaintiffs' due process claim, which rests on the assertion that the New Mexico Constitution, through its PCC and Inherent Rights and Due Process Clauses, implies a "fundamental right to a beautiful and healthful environment." *See* N.M. Const. art. XX, § 21; *see also* N.M. Const. art. II, § 4 ("All persons are born equally free, and

35

have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."); N.M. Const. art. II, § 18 ("No person shall be deprived of life, liberty or property without due process of law."). Plaintiffs allege that Defendants' authorization and management of oil and gas extraction and the resulting pollution violate this fundamental right as well as Plaintiffs' rights to life, liberty, property, safety, and happiness as recognized in the Due Process and Inherent Rights Clauses. Plaintiffs extend this argument to reincorporate their assertion that Defendants are obligated to enact a "sufficient statutory, regulatory and enforcement scheme that controls pollution." Thus, despite our conclusion regarding the PCC and the lack of an associated individual right, we must determine if the Due Process Clause may serve as a separate vehicle for Plaintiffs' allegations.[8] We conclude that it cannot.

{53}     The due process protections under Article II, Section 18 of the New Mexico Constitution include substantive components, which protect against "a statute or government action [that] shocks the conscience or interferes with rights implicit in

_____

[8]We note that our above-stated concerns regarding separation of powers also shape the confines of our analysis of Plaintiffs' due process claim. Nonetheless, the DJA specifically grants courts the "power to declare rights . . . whether or not further relief is or could be claimed." Section 44-6-2. Thus, while separation of powers continues to limit our review of Plaintiffs' claims, we must determine whether Plaintiffs have sufficiently pleaded a violation of their due process rights such that declaratory relief to that effect could be granted.

36

the concept of ordered liberty." *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 50, 306 P.3d 457 (internal quotation marks and citation omitted). The rights "implicit in the concept of ordered liberty" are those deemed to be "fundamental rights." *Am. Civ. Liberties Union of N.M. v. City of Albuquerque*, 2006-NMCA-078, ¶ 16, 139 N.M. 761, 137 P.3d 1215 (internal quotation marks and citation omitted). "The threshold question in evaluating a due process challenge is whether there is a deprivation of liberty or property." *Bounds*, 2013-NMSC-037, ¶ 51 (alteration, internal quotation marks, and citation omitted). Generally, to determine whether Plaintiffs were deprived of an individual right, fundamental or otherwise, or other liberty or property interest, we first look to federal precedent construing an analogous provision in the United States Constitution. *See Morris*, 2016-NMSC-027, ¶¶ 18-19 (applying the "interstitial approach").

{54}     Here, "[o]ur state constitution's due process guarantees are analogous to the due process guarantees provided under the United States Constitution." *Id.* ¶ 18. However, Plaintiffs do not point us to, nor has our research revealed, federal precedent recognizing a due process right to adequate pollution control policies or a beautiful and healthful environment. Indeed, Plaintiffs' due process claims are largely based on the presence of the PCC and the Inherent Rights Clause of the New Mexico Constitution, which have no federal analog. *See* N.M. Const. art. XX, § 21; N.M. Const. art. II, § 4. Thus, federal case law construing the United States

37

Constitution's Due Process Clause is not applicable, and we must consider whether New Mexico's distinctive characteristics—either in law or through its history and tradition—imply or recognize an individual right to adequate environmental protection or a beautiful and healthful environment, as Plaintiffs suggest.

{55} Beginning with the PCC, we reiterate that it does not recognize any enforceable rights, but instead requires the Legislature to balance competing policy interests. *See* N.M. Const. art. XX, § 21. Indeed, one of those interests, the use and development of the state's natural resources, impliedly *permits* pollution. *See id.* Thus, the PCC cannot be interpreted on its own to support an inferred due process right to a "beautiful and healthful environment." *See id.* Plaintiffs next point to the Inherent Rights Clause, N.M. Const. art. II, § 4, arguing that it is a distinctive characteristic of the New Mexico Constitution that supports a fundamental right to a "beautiful and healthful environment" that can be enforced through the Due Process Clause. Plaintiffs acknowledge, however, that the Inherent Rights Clause has not been interpreted "to be a fountain for as-yet-undiscovered rights." *Morris v. Brandenburg*, 2015-NMCA-100, ¶ 59, 356 P.3d 564 (Hanisee, J., concurring in part), *aff'd*, 2016-NMSC-027; *see also Morris*, 2016-NMSC-027, ¶ 51 ("[T]he Inherent Rights Clause has never been interpreted to be the exclusive source for a fundamental or important constitutional right, and on its own has always been subject to reasonable regulation."). Thus, Plaintiffs provide us with no legal

38

authority supporting their claim that the New Mexico Constitution provides or recognizes a right supporting their claims, fundamental or otherwise.

{56} Plaintiffs assert that, aside from unique constitutional provisions, "the right to a beautiful and healthful environment is grounded in the law, history and tradition of our state." However, by Plaintiffs' own allegations, New Mexico has a long history of balancing natural resource development with environmental protection. The PCC and the Land Grant Permanent Fund are textual evidence of this history. *See* N.M. Const. art. XX, § 21; N.M. Const. art. XII, §§ 2, 7 (investing revenue from lease of public lands into the state's public schools). While Plaintiffs correctly observe that, as the "Land of Enchantment," the state's beauty is central to our identity, we cannot ignore the long history of permitting oil and gas extraction within our borders. If anything, the law, history, and tradition of our state demonstrates that resource extraction must be considered alongside, and must coexist with, pollution control legislation.

{57} As such, the New Mexico Constitution does not recognize, through either the Due Process or Inherent Rights Clauses or the PCC, an individual right that supports Plaintiffs' complaint.[9] Absent such a right or liberty or property interest, Plaintiffs'

---

[9]We note that Plaintiffs also allege a due process violation on the basis that Defendants' actions constitute "deliberate indifference to [Plaintiffs'] li[ves], liberty, property, safety or happiness." On appeal, Plaintiffs draw the "deliberate indifference" standard from a case considering inadequate medical treatment of incarcerated inmates, *see Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 30,

39

due process claim must necessarily fail and we need not subject the laws and regulations they challenge to any level of scrutiny. *See Bounds*, 2013-NMSC-037, ¶¶ 50-54 (stating, "In order to prevail on a substantive due process claim, the plaintiff must establish that its property interests were *injured* by governmental action that shocks the conscience," and concluding that since the petitioners had "not been deprived of anything," their "due process challenge must fail" (internal quotation marks and citation omitted)); *see also Nash v. Bd. of Cnty. Comm'rs of Catron Cnty.*, 2021-NMSC-005, ¶ 36, 480 P.3d 842 ("Substantive due process cases inquire whether a statute or government action shocks the conscience or interferes with rights implicit in the concept of ordered liberty." (internal quotation marks and citation omitted)).

---

144 N.M. 314, 187 P.3d 179, and further argue that Defendants' conduct "shocks the conscience." Plaintiffs have not shown the deliberate indifference standard is applicable outside of the above context, which includes a showing that prison officials acted with a "sufficiently culpable state of mind." *See Cordova v. LeMaster*, 2004-NMSC-026, ¶ 30, 136 N.M. 217, 96 P.3d 778 (internal quotation marks and citation omitted). We conclude that Plaintiffs have not established that the "deliberate indifference" standard has any place in this context, and they have not alleged sufficient facts to support it. Regarding Plaintiffs' argument that Defendants' actions shock the conscience, this allegation is not present in Plaintiffs' complaint. Moreover, "shocking the conscience" requires facts that demonstrate "truly horrendous situations of governmental abuses." *Starko, Inc. v. Gallegos*, 2006-NMCA-085, ¶ 25, 140 N.M. 136, 140 P.3d 1085 (internal quotation marks and citation omitted). Plaintiffs do not allege facts supporting this claim, and we conclude this allegation to be unsupported by Plaintiffs' complaint.

40

## III. Equal Protection

{58} The final claims in Plaintiffs' complaint allege that Defendants have violated their state constitutional right to equal protection under law. *See* N.M. Const. art. II, § 18 (stating no person shall "be denied equal protection of the laws"). Plaintiffs claim that Defendants' failure to "adequately regulate oil and gas production and pollution" has resulted in unconstitutionally disparate treatment of frontline community members (people who live near oil and gas production cites), Indigenous people, and New Mexico's youth. On appeal, the Legislature and Executive Defendants argue, in pertinent part, that Plaintiffs' allegations fail to establish a valid equal protection claim because they have not identified government-created classes of persons subject to discriminatory treatment. In their answer brief, Plaintiffs concede that they are not alleging Defendants have created or enforced any facially discriminatory statute. Rather, Plaintiffs argue that Defendants' failure to control pollution has disproportionally affected them in comparison with other similarly situated New Mexicans. We conclude Plaintiffs have not established a viable equal protection claim.

{59} "Equal protection guarantees prohibit the government from creating statutory classifications that are unreasonable, unrelated to a legitimate statutory purpose, or are not based on real differences." *Breen v. Carlsbad Mun. Schs.*, 2005-NMSC-028, ¶ 7, 138 N.M. 331, 120 P.3d 413. "The threshold question in analyzing all equal

41

protection challenges is whether the legislation creates a class of similarly situated individuals who are treated dissimilarly." *Id.* ¶ 10. Only if a plaintiff is successful in establishing unconstitutional governmental classification, either expressly or as applied through conduct, do we then determine what level of scrutiny to apply to the challenged government act and review the law thereunder. *See id.* ¶ 8 ("If [the p]etitioners are successful in proving [dissimilar treatment due to legislative classification], then a court must determine what level of scrutiny should be applied."); *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 23, 137 N.M. 734, 114 P.3d 1050 (holding that because the statute challenged differentiated between two classes of people as applied, the court had to then apply the appropriate level of scrutiny).

{60} Here, Plaintiffs do not allege that any statute or conduct creates any classification at all. Instead, Plaintiffs' equal protection claims rest squarely on their assertion that Defendants' failure to "adequately regulate oil and gas extraction" causes Plaintiffs to "suffer harsher, disproportionate and discriminatory levels of contamination, environmental degradation and health risks as compared with other New Mexicans." While Plaintiffs do point to specific statutes exempting oil and gas pollution from certain legislative enactments, *see, e.g.*, § 74-4-3(K)(2)(a), these statutes create neither expressly identified classes nor "as-applied" discrimination of the type the Equal Protection Clause protects against. *See Marrujo v. N.M. State*

*Highway Transp. Dep't*, 1994-NMSC-116, ¶ 9, 118 N.M. 753, 887 P.2d 747 ("Equal protection . . . focuses on the validity of legislation that permits some individuals to exercise a specific right while denying it to others."); *State v. Gwynne*, 2018-NMCA-033, ¶ 42, 417 P.3d 1157 ("A statute that does not create two separate classifications subject to different treatment cannot be said to violate equal protection." (internal quotation marks and citation omitted)).

{61} Plaintiffs' claims seek to cast the effects of pollution as de facto classifications that result in discriminatory treatment. Nowhere in our jurisprudence have New Mexico courts held that generally applicable, facially neutral statutes that result in incidental harms based on the geographic location of individuals violate the Equal Protection Clause of the New Mexico Constitution. Moreover, the geographic proximity of Plaintiffs to places with elevated instances of oil and gas development—and the related pollution—leads more appropriately to the conclusion that Plaintiffs are not similarly situated to other New Mexicans, rather than a determination that a government classification exists. *See Breen*, 2005-NMSC-028, ¶ 7 ("Equal protection, both federal and state, guarantees that the government will treat *individuals similarly situated* in an equal manner." (emphasis added)). We, therefore, conclude Plaintiffs have alleged no classification that results in discriminatory treatment and have not presented an equal protection claim upon

43

which relief can be granted. As such, we need not apply any level of scrutiny to the laws they challenge.

**CONCLUSION**

{62}　For the reasons explained above, we reverse the order of the district court denying Defendants' motions to dismiss. We remand with instructions that the district court is to dismiss Plaintiffs' complaint.

{63}　**IT IS SO ORDERED.**

_____

**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____

**JACQUELINE R. MEDINA, Chief Judge**

**KATHERINE A. WRAY, Judge (specially concurring)**

**WRAY, Judge (specially concurring).**

{64}     The Court's opinion rejects the position that the PCC establishes an individual or enforceable right under the New Mexico Constitution to a beautiful and healthful environment. To this extent, I join completely in the analysis of the PCC's language and of the justiciability doctrines. The Court's opinion, however, takes a step further and limits the PCC's language to the creation of a Legislative duty to balance interests. I hesitate to foreclose the possibility that the PCC creates any right at all, especially when a constitutional duty could be read to acknowledge a corresponding constitutional right. *Cf. Van Soelen*, 2023-NMSC-027, ¶ 26 (declining to decide whether certain constitutional provisions are "merely meant to express basic political principles or are meant as a textual enumeration of certain substantive rights" (omission, alteration, internal quotation marks, and citation omitted)). Regardless of whether any right exists, the nature of Plaintiffs' claims and the relief requested would require the judiciary to second-guess the policy choices the Legislature has made pursuant to its constitutional duty under the PCC, and as the Court's opinion explains, judicial review of those choices would be without legal standards or guideposts. Short of examining the policy reasons supporting the Legislature's decisions, no further judicial inquiry is constitutionally justified. *See id.* ¶ 37. Because the existence of *no* right is not essential to the justiciability holding, I would

45

limit the holding to reject only the right that Plaintiffs posit—the right to a beautiful and healthful environment.

{65} This is because absence of any right does impact the remaining constitutional analysis, because constitutional rights have power even if a cause of action does not directly lie. The contours of the right to be protected are a vital part of any claim brought by a party who alleges that the enforcement or lack of enforcement of a statute or regulation has violated due process or equal protection principles. *See Morris*, 2016-NMSC-027, ¶¶ 18, 19 (considering first for the purposes of due process analysis "whether an asserted right is protected" under the federal or state constitutions); *see also Marrujo*, 1994-NMSC-116, ¶ 9 ("Equal protection, on the other hand, focuses on the validity of legislation that permits some individuals to exercise a specific right while denying it to others."). The analysis of Plaintiffs' due process claims in the Court's opinion depends heavily on the view that the PCC affords no individual, enforceable constitutional right. I disagree, because regardless of whether no individual, enforceable right exists in the PCC—a question I think we need not answer broadly—it does not necessarily follow that no constitutionally protected right or interest exists to support a due process claim.

{66} The constitutional challenge must instead be put in the relevant constitutional context, even though the outcome may be the same. In the absence of a fundamental right, due process review is limited to whether Defendants have asserted a rational

46

basis for the entire statutory and regulatory system for pollution control in New Mexico. *See Morris*, 2016-NMSC-027, ¶ 52. I agree that the PCC creates no fundamental right to a beautiful or healthful environment. As the Court's opinion explained, the Legislature struck a balance between pollution control and the use and development of natural resources, and the Executive Defendants have implemented regulations and administer that balance. *See* Op. ¶¶ 34-37. Applying rational basis review, Plaintiff has not "demonstrate[d] that the legislation is not supported by a firm legal rationale or evidence in the record." *Morris*, 2016-NMSC-027, ¶ 57.

{67} Similarly, Plaintiffs' equal protection claim is not dependent entirely on the existence of a fundamental right. Whether a court applies strict or a lesser form of scrutiny depends on whether the plaintiff can establish either that the "violated interest is a fundamental personal right or civil liberty" or that the governmental action "focuses upon inherently suspect classifications." *Marrujo*, 1994-NMSC-116, ¶ 10. If the claim implicates only an "important—rather than fundamental—individual interest" or a "sensitive—rather than suspect—classification," intermediate scrutiny is warranted. *Id.* ¶ 11. To "all other interests," rational basis scrutiny again applies. *Id.* ¶ 12 (internal quotation marks and citation omitted). As noted, Plaintiffs have established no fundamental right and have otherwise not argued for intermediate scrutiny. The question of suspect classifications therefore becomes the key.

{68} Plaintiffs allege that Defendants' conduct has had a disparate impact on people who live near oil and gas sites, Indigenous peoples, and youth who feel the effects of pollution disproportionately to other New Mexicans. The Court's opinion focuses on the neutral nature of the statutory and regulatory scheme and disposes of Plaintiffs' equal protection claim based on the lack of explicit classifications of people. *See* Op. ¶¶ 58-61. The statutory and regulatory scheme, however, on its face does create two classes of people: those who live near permitted oil and gas sites and those who do not. Within the category of those who live near oil and gas sites, Plaintiffs' arguments identify groups of people who are disproportionately affected and suggest that these are improper classifications based on race and intrinsic characteristics. *See Marrujo*, 1994-NMSC-116, ¶ 10 (identifying as "suspect classifications . . . race, national origin, religion, or status as a resident alien"). But the facially neutral statutory and regulatory scheme, absent something more, cannot be said to be responsible for the disproportionate impact of pollution on these subgroups, which themselves are not created by the statutory or regulatory scheme. Plaintiffs do not allege facts to support a conclusion that Defendants' actions or inactions have caused oil and gas sites to be located disproportionately near a particular racial, cultural, or generational group. As a result, with no suspect or quasi-suspect class implicated, rational basis review is again appropriate and the statutory and regulatory scheme easily passes muster under that standard. *See id.* ¶ 12 ("The

48

rational basis standard of review is triggered by all other interests: those that are not fundamental rights, suspect classifications, important individual interests, and sensitive classifications." (internal quotation marks omitted)).

{69}     I therefore write separately, to express a more narrow view of the necessary holding regarding the rights inherent in the PCC and an alternate view of Plaintiffs' due process and equal protection claims. Otherwise, I join the Court's opinion.


_____

**KATHERINE A. WRAY, Judge**